[Cite as *Hicks v. Clermont Cty. Republican Cent. Commt.*, 2025-Ohio-2913.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| CHRISTOPHER R. HICKS, | : | CASE NO. CA2025-01-005 |
| Appellant, | : | |
| | : | OPINION AND JUDGMENT ENTRY 8/18/2025 |
| - vs - | : | |
| | : | |
| CLERMONT COUNTY REPUBLICAN CENTRAL COMMITTEE, et al., | : | |
| | : | |
| Appellees. | : | |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2024 CVH 00009

Christopher R. Hicks, pro se.

Subashi, Wildermuth & Justice, and Brian L. Wildermuth, for appellees.

# **O P I N I O N**

**M. POWELL, J.**

{¶ 1} Appellant, Christopher R. Hicks, appeals a decision of the Clermont County Court of Common Pleas granting judgment on the pleadings and dismissing his complaint against appellees, the Clermont County Republican Central Committee ("CCRCC"), Jeff

Corcoran, and Byron Baxter (collectively referred to as CCRCC, except where indicated).

{¶ 2} The CCRCC is the controlling committee for the Clermont County Republican Party. Corcoran and Baxter are its chairman and vice-chairman, respectively. The CCRCC is organized under the auspices of R.C. Chapter 3517. This includes R.C. 3517.02 regarding the election of members to the controlling committees of each major political party; R.C. 3517.03 discussing the membership of committeepersons who have been elected onto each major political party's controlling committee; and R.C. 3517.05 addressing the procedure to fill vacancies within each major political party's controlling committee.

{¶ 3} On May 3, 2022, Hicks was elected to the CCRCC to serve a four-year term as the committeeperson for precinct P1P located in Union Township, Clermont County, Ohio. There are 168 committeeperson positions on the CCRCC, one seat for each precinct located within the county. The record indicates that 48 of those seats were left vacant following the May 3, 2022 election. Following Hicks' election, several CCRCC members complained that Hicks had reportedly challenged the local Democratic Party to run candidates against Republican candidates, mocked and ridiculed Republican candidates and causes, and personally attacked other Republicans who were members of or had been endorsed by the CCRCC.

{¶ 4} Subsequently, a motion was made to the CCRCC to indefinitely suspend Hicks from all CCRCC's activities "unless they conflict with a political party's central committee's duties pursuant to the Revised Code and official public meetings." Hicks was notified of the pendency of the motion to suspend him, its basis, and its upcoming consideration by CCRCC. The motion came before CCRCC on September 20, 2023. During discussion of the motion, Hicks was permitted to respond to the allegations. By a vote of 56-13 Hicks was indefinitely suspended from participating in the business and

political functions of CCRCC, including endorsement of candidates and how CCRCC spends its funds. Hicks retained the right to participate in the statutory functions of CCRCC, including voting to fill vacancies in local elected office pursuant to R.C. 305.02.

{¶ 5} On January 4, 2024, Hicks filed a complaint seeking a declaratory judgment and permanent injunction against CCRCC, Corcoran, and Baxter, and a temporary restraining order. The complaint asserted that CCRCC had 30 members who did not meet the qualifications of office for the precincts they purported to represent, that CCRCC had 30 precincts in which more than one member resided, and that Hicks had attended a CCRCC meeting on December 18, 2023, but was not allowed to participate. Based upon the foregoing, the complaint alleged that CCRCC, through the actions of its chairman and vice-chairman, was operating as a "sham organization" that had been appointing unqualified committeepersons to fill its precinct vacancies in violation of R.C. 3517.02, 3517.03, and 3517.05, and Article XV, Section 4 of the Ohio Constitution, which had resulted in Hicks' "voting rights being unlawfully diluted."

{¶ 6} As pertinent here, Article XV, Section 4 of the Ohio Constitution provides, "No person shall be elected or appointed to any office in this state unless possessed of the qualifications of an elector." R.C. 3503.01(A) provides that every United States citizen aged 18 years or older "who has been a resident of the state thirty days immediately preceding the election at which the citizen offers to vote, is a resident of the county and precinct in which the citizen offers to vote, and has been registered to vote for thirty days, has the qualifications of an elector and may vote at all elections in the precinct in which the citizen resides." In turn, R.C. 3517.05 provides in relevant part that "[i]n case of vacancies caused by death, resignation, failure to elect, or removal from the precinct . . . from which a committeeman was chosen, the controlling committee . . . shall fill the vacancy for the unexpired term by a majority vote of the members of such committee."

Hicks argues that Article XV, Section 4 of the Ohio Constitution requires committeepersons to live in the precinct they represent, and that the committeeperson selected to fill a vacancy must live in the precinct he or she will represent.

{¶ 7} The complaint also alleged that despite Hicks' status as the elected committeeperson for Union Township's precinct P1P, CCRCC had failed to notify him of meetings and had improperly excluded him from participating in its political meetings and political functions, including the December 18, 2023 meeting, which had resulted in the endorsement of a candidate for clerk of courts which would have failed had Hicks been afforded a vote. On January 10, 2024, the trial court denied Hicks' request for a temporary restraining order.

{¶ 8} On January 17, 2024, Hicks moved for a preliminary injunction to allow him to participate in all CCRCC's functions during the pendency of the case and to disallow participation by unqualified appointed committee members. A hearing on the motion was held on January 31, 2024. On February 6, 2024, the trial court denied Hicks' motion for a preliminary injunction on the ground Hicks failed to establish each of the four requisite factors by clear and convincing evidence.[1]

{¶ 9} In denying Hicks' motion, the trial court specifically found that (1) R.C. 3517.05 does not require that appointees to vacant committee member seats be residents of the precinct they represent; (2) Article XV, Section 4 of the Ohio Constitution does not apply to the office of a precinct committee member, and therefore does not require that appointees to vacant committee member seats be residents of the precinct they

---

1. When ruling on an applicant's request for a preliminary injunction, a trial court must consider four factors: (1) whether the moving party has shown a strong or substantial likelihood that he or she will prevail on the merits of the underlying substantive claim; (2) whether the moving party will suffer irreparable harm if the injunction is not granted; (3) whether the issuance of the injunction will not harm third parties; and (4) whether the public interest would be served by issuing the preliminary injunction. *Hicks v. Clermont Cty. Republican Cent. Commt.*, 2024-Ohio-3049, ¶ 17 (12th Dist.). The applicant seeking the preliminary injunction bears the burden of establishing each factor by clear and convincing evidence. *Id.*

represent, because precinct committee members do not hold an office within the meaning of the Ohio Constitution as the office of a political party is not a public office under R.C. 3517.01(C)(9), and a person elected or appointed to a precinct committee seat is not a public official or employee under R.C. 102.01(B) and 3517.01(C)(13); and (3) as a result of his suspension, Hicks was only precluded from participating in the political functions of CCRCC and was still permitted to participate in statutory/governmental functions, such as filing a vacancy in local elected offices under R.C. 305.02.

{¶ 10} Hicks moved the trial court to reconsider its denial of his motion for a preliminary injunction. The trial court denied Hicks' motion for reconsideration, finding that the "arguments and citations" presented in Hicks' motion were "essentially the same" as what Hicks had presented at the January 31, 2024 preliminary injunction hearing.

{¶ 11} In the interim, CCRCC filed an answer to Hicks' complaint on February 5, 2024. The answer admitted that CCRCC has 30 precincts in which more than one member resided, and that on September 20, 2023, CCRCC suspended Hicks from participating in all CCRCC's functions, except those regarding CCRCC's statutory functions. The answer asserted that in the case of a precinct vacancy, if CCRCC is unable to fill the vacancy with a resident of the precinct, CCRCC may appoint a non-precinct resident to the vacancy; however, such appointed nonresident is not entitled to vote on matters involving CCRCC's statutory duties, such as filling vacancies under R.C. 305.02.

{¶ 12} Hicks appealed the trial court's denial of his motion for a preliminary injunction to this court. As pertinent here, Hicks argued that the trial court erred by failing to apply, or by misapplying, R.C. 3517.03 and Article XV, Section 4 of the Ohio Constitution, and by failing to define or list the statutory functions of elected committeepersons.

{¶ 13} On August 12, 2024, this court upheld the trial court's denial of Hicks' motion

for a preliminary injunction. *Hicks v. Clermont Cty. Republican Cent. Commt.*, 2024-Ohio-3049 (12th Dist.) (*Hicks I*). This court agreed with the trial court's analysis and held that (1) there is no requirement under R.C. 3517.05 that appointees to vacant committee member seats be residents of the precinct they represent; (2) given the definitions of "public office" and "public official or employee" under R.C. 102.01(B), 3517.01(C)(9), and 3517.01(C)(13), committeepersons like Hicks do not hold an "office" within the meaning of Article XV, Section 4 of the Ohio Constitution, thereby indicating that Article XV, Section 4 applies to public offices and that its residency requirement does not apply to committeepersons; and (3) Hicks' suspension from participating in CCRCC's political functions did not violate his rights to free speech and peaceably assemble. *Hicks I* at ¶ 21, 24-25.

{¶ 14} This court further held,

> There is no dispute that Hicks' suspension has not precluded him from participating in the statutorily prescribed, so-called "governmental" functions of the CCRCC. This necessarily includes Hicks being permitted to consider and vote to fill vacancies in county offices pursuant to R.C. 305.02. Committeepersons who are appointed to represent a precinct other than the precinct in which the appointed committeeperson resides, however, are not permitted to participate in the governmental functions of the CCRCC. This is because, at least according to the CCRCC, the appointed committeeperson is not deemed an "elector" who had been elected to represent that precinct as that term is used in R.C. 3517.02.

*Id.* at ¶ 5, fn. 5.

{¶ 15} Hicks appealed *Hicks I* to the Ohio Supreme Court, raising four propositions of law. As pertinent here are Proposition of Law No. 1—To run, be elected, or be appointed to a central committee one must be a qualified elector in the precinct (Constitution Article XV, Section 4, R.C. 3517.05, R.C. 3517.03, R.C. 3517.02)—and Proposition of Law No. 2—A member has a statutory right to participate in all functions conferred to such

- 6 -

members in statute, or in obligations of the body mandated by statute. The Supreme Court declined jurisdiction.

{¶ 16} On September 11, 2024, with leave of the trial court, CCRCC moved for judgment on the pleadings pursuant to Civ.R. 12(C). On December 3, 2024, Hicks moved to strike CCRCC's motion for judgment on the pleadings, moved for leave to file a motion for summary judgment, and filed a reply to CCRCC's motion for judgment on the pleadings. By judgment entry of December 27, 2024, the trial court denied Hicks' motion to strike the motion for judgment on the pleadings and his motion for leave to move for summary judgment. The trial court granted CCRCC's Civ.R. 12(C) motion for judgment on the pleadings, thereby dismissing Hicks' complaint, on the grounds of the law-of-the-case doctrine and the limitation on judicial involvement in the internal affairs of a political party.

{¶ 17} Hicks now appeals, raising seven assignments of error. We note that while Hicks ostensibly appeals the trial court's December 27, 2024 judgment entry granting CCRCC's motion for judgment on the pleadings, his brief is heavily focused on relitigating this court's opinion in *Hicks I* and to some extent, the trial court's February 6, 2024 judgment entry denying Hicks' motion for a preliminary injunction. Accordingly, Hicks' fifth and seventh assignments of error, which challenge the trial court granting judgment on the pleadings to CCRCC, will be addressed together. Hicks' first, third, fourth, and sixth assignments of error, which challenge this court's opinion in *Hicks I* and the trial court's February 6, 2024 judgment entry will be addressed together. Hicks' second assignment of error will be addressed separately.

{¶ 18} Assignment of Error No. 1:

THE COURT ERRED BY NOT APPLYING THE QUALIFIED ELECTOR REQUIREMENT OF THE OHIO CONSTITUTION, ARTICLE XV, SECTION 4.

- 7 -

{¶ 19} Assignment of Error No. 3:

THE COURT ERRED BY HOLDING "REMOVAL FROM THE PRECINCT," PER R.C. 3517.05, DOES NOT APPLY TO APPOINTED MEMBERS.

{¶ 20} Assignment of Error No. 4:

THE COURT ERRED BY IGNORING THE STATUTORY REQUIREMENT THAT A CENTRAL COMMITTEE CAN HAVE BUT ONE MEMBER FROM ANY GIVEN PRECINCT.

{¶ 21} Assignment of Error No. 6:

THE COURT ERRED BY CITING, BUT NOT DEFINING, THE "STATUTORY FUNCTIONS" OF A CENTRAL COMMITTEE.

{¶ 22} In his first assignment of error, Hicks argues that the trial court and this court erred in holding that Article XV, Section 4 of the Ohio Constitution does not prohibit appointment of individuals to CCRCC seats for precincts in which they do not reside because they do not possess the qualifications of an elector in the precinct seat to which they are appointed. Stated otherwise, and based upon his summary analysis, Hicks challenges this court's ruling in *Hicks I* that the residency requirement of Article XV, Section 4 does not apply to precinct committee members and only applies to public offices. *See Hicks I*, 2024-Ohio-3049 at ¶ 24.

{¶ 23} In his third and fourth assignments of error, Hicks argues that the trial court and this court erred in holding there is no statutory requirement that appointees to vacant seats on a controlling committee like the CCRCC must reside in the precinct he or she represents. *See Hicks I* at ¶ 20-21. Hicks argues that such ruling violates R.C. 3517.03 and 3517.05. R.C. 3517.03 provides that a county central committee shall consist of one member from each election precinct in the county. R.C. 3517.05 addresses the procedure to fill vacancies within a controlling committee due to, among other reasons, "failure to elect" a committeeperson to fill each available member position on the committee, and "removal from the precinct."

- 8 -

{¶ 24} In his sixth assignment of error, Hicks challenges the failure of the trial court and this court to identify, enumerate, and describe which statutes present "statutory functions," instead choosing to only cite R.C. 305.02 as an example.[2] In response to Hicks' foregoing assignments of error, CCRCC argues they are barred by the law-of-the-case doctrine.

{¶ 25} The law-of-the-case doctrine provides that "the decision of a reviewing court in a case remains the law of that case on legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Giancola v. Azem*, 2018-Ohio-1694, ¶ 14. The doctrine is necessary to ensure consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution. *Id.* Although the doctrine is considered a rule of practice rather than a binding rule of substantive law, it "functions to compel trial courts to follow the mandates of reviewing courts," and "[a]bsent extraordinary circumstances, such as an intervening decision by the [Ohio] Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." *Id.* at ¶ 15, citing *State ex rel. Potain v. Mathews*, 59 Ohio St.2d 29, 32 (1979). The doctrine comes into play only with respect to issues previously determined. *Giancola* at ¶ 16. Thus, only those legal questions resolved by a reviewing court are the law of that case. *Id.* at ¶ 22.

{¶ 26} Moreover, under the law-of-the-case doctrine, the denial of jurisdiction over a discretionary appeal by the Ohio Supreme Court settles the issue of law appealed. *Sheaffer v. Westfield Ins. Co.*, 2006-Ohio-4476, ¶ 16. That is, where the Supreme Court refuses jurisdiction following the issuance of an opinion by a court of appeals, the court

---

2. Hicks raises the same argument in his second issue for review under his second assignment of error.

of appeals' opinion becomes the law of the case in both the trial court and the reviewing courts, and the court of appeals has no obligation to revisit its decision. *Hubbard ex rel. Creed v. Sauline*, 1996-Ohio-174, ¶ 14; *Musial Offices, Ltd. v. Cuyahoga Cty.*, 2022-Ohio-1944, ¶ 15 (8th Dist.).

{¶ 27} Although they are couched in slightly different terms, the procedural history of the case shows that Hicks' arguments in his first, third, fourth, and sixth assignments of error were raised before and rejected by the trial court in its decision denying Hicks' motion for a preliminary injunction, were raised in his direct appeal from that trial court's decision and subsequently rejected by this court in *Hicks I*, and were then the bases for Hicks' first and second propositions of law in his memorandum in support of jurisdiction before the Ohio Supreme Court.

{¶ 28} Specifically, in his first proposition of law, Hicks argued that this court erred in finding that Article XV, Section 4 of the Ohio Constitution only applies to public offices because Article XV, Section 4 does not say "public office"; the office of a committee member is not a public office under R.C. 3517.01(C)(9) but is an office nevertheless; therefore, a committee member is subject to the Article XV, Section 4 residency requirement; and pursuant to R.C. 3517.02, 3517.03, and 3517.05, the central committee can only have one member from each precinct and that member must be a qualified elector. In his second proposition of law, Hicks argued that this court erred in failing to address a committee member's statutory rights beyond R.C. 305.02 and in failing to consider all the direct and implied rights of a committee member. Hicks asserted that an elected committee member has privilege to participate in the body to which he or she is elected and in all functions enumerated in the statutes, not just in R.C. 305.02.

{¶ 29} The Supreme Court declined jurisdiction, thereby "foreclosing any argument as to [these] point[s] of law." *Sheaffer*, 2006-Ohio-4476, at ¶ 14. When the Supreme Court

declined to accept the appeal of *Hicks I*, Hicks' case "was finally decided" on the issues above and *Hicks I* became the law of the case. *Id.* at ¶ 15; *RNE Ents., L.L.C. v. Imperial Kitchen Cabinet Factory, L.L.C.*, 2024-Ohio-5327, ¶ 34 (8th Dist.).

{¶ 30} Our dissenting colleague discounts the Supreme Court's declination of jurisdiction because CCRCC argued that the appeal should not be accepted based upon its "interlocutory nature" and the Supreme Court "could have focused" on that aspect in declining jurisdiction. Because the Supreme Court offered no explanation for its declination of jurisdiction, the suggestion that it was based upon the "interlocutory nature" of the appeal is conjecture. Moreover, the appeal was not interlocutory in the sense that it involved a final appealable order pursuant to R.C. 2505.02(B)(4), meaning that absent the right to an immediate appeal, Hicks would otherwise "not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims and parties in the action." Finally, our opinion in *Hicks I* essentially settled the controversy as it concerned matters of law and an uncontroverted factual record. Thus, there is good reason to credit the supreme court's declination of jurisdiction in deciding whether the law of the case doctrine should apply.

{¶ 31} Hicks' first, third, fourth, and sixth assignments of error are overruled, and his second issue for review under his second assignment of error lacks merit.

{¶ 32} Assignment of Error No. 2:

> THE COURT ERRED IN INVENTING A BIFURCATED CENTRAL COMMITTEE "PARTICIPATION" UNSUPPORTED BY STATUTE.

{¶ 33} This assignment of error ostensibly relates to CCRCC's indefinite suspension of Hicks from participating in the CCRCC's political functions but not in its statutory functions. In denying Hicks' motion for a preliminary injunction, the trial court declined to determine whether Hicks was properly suspended from participating in the

CCRCC's "non-statutory actions," citing the court's limited judicial intervention into the internal affairs and operations of political parties. *Hicks I* held that although he was indefinitely suspended from participating in the CCRCC's political functions, Hicks was not precluded from engaging in political duties within his precinct and elsewhere. *Hicks I*, 2024-Ohio-3049, at ¶ 25. This court further held that Hicks was also not precluded from participating in the CCRCC's statutory/governmental functions, unlike committeepersons appointed to represent a precinct other than their precinct of residence. *Id.* at ¶ 5, fn.5.

{¶ 34} Hicks asserts that *Hicks I* improperly recognizes a bifurcated county central committee of a political party, one exercising statutory functions and another exercising political/internal functions.

{¶ 35} However, in the context of judicial intervention into internal affairs, the Ohio Supreme Court and courts of appeals have recognized the bifurcated nature of political parties. Indeed, the Supreme Court has characterized "[p]olitical parties as basically voluntary associations of persons who act together principally for party and community purposes." *State ex rel. Cain v. Kay*, 38 Ohio St.2d 15, 18 (1974). "Courts should defer to the appropriate party tribunals established by the members for the resolution of internal disputes of the party." *Id.* at 18-19. "[I]t is only where party officers assume duties affecting activities beyond the sphere of the internal affairs of the party and exercise official powers that are part of the sovereign functions of the state, properly exercisable for the public benefit, that the courts will intercede." *Id.* at 19. *See also Cent. Commt. of Hamilton Cty. Republican Party v. Kohnen*, 1991 Ohio App. LEXIS 3800 (1st Dist. Aug. 9, 1991).

{¶ 36} The Eighth District Court of Appeals has likewise recognized that many of the affairs of a political party are controlled by party rules:

> The courts of the United States have had a long history of not interfering in the internal affairs of political parties. The reasons for this position taken by the courts are simple.

> Although political parties have certain public responsibilities, they are basically voluntary associations made up of persons who act together for various community and party purposes and who are governed in most respects by their own rules and usages. Furthermore, political parties normally provide their own procedures and tribunals for the resolution of their internal affairs. Consequently, the courts of the United States have been consistent in holding that party tribunals rather than the courts of law provide the proper forum in which actions such as in the instant case are to be decided.

{¶ 37} *State ex rel. McCurdy v. De Maioribus*, 9 Ohio App.2d 280, 281 (8th Dist.1967), citing *State ex rel. Webber v. Felton*, 77 Ohio St. 554, 579-580 (1908).

{¶ 38} In two separate cases, the Eleventh District Court of Appeals considered whether the Ohio Open Meetings Act (R.C. 121.22) applied to meetings of political party committees. The court of appeals held that the Open Meetings Act did not apply to a meeting at which the central committee voted to appoint new members because it involved only the internal affairs of the party:

> Although none of the foregoing cases deals with the application of Ohio's Open Meetings Act to a central committee meeting to amend its internal bylaws and appoint new members, a collective reading of the above establishes that although members of a central committee of a political party are public officers upon acting under the authority granted in R.C. 305.02 in filling vacancy in county offices, these same committee members do not constitute public officials engaged in public meetings when they are addressing the internal affairs of the political party.

*Jones v. Geauga Cty. Republican Party Cent. Commt.*, 2017-Ohio-2930, ¶ 35 (11th Dist.), citing *Cain*, 38 Ohio St.2d 15; and *State ex rel. Hayes v. Jennings*, 173 Ohio St. 370 (1962). Similarly, the court of appeals held that the Open Meetings Act did not apply to a political party central committee's election of officers under R.C. 3517.04 because such involved the internal affairs of a political party. *Ames v. Geauga Cty. Republican Cent. Commt.*, 2023-Ohio-3689, ¶ 3, 34 (11th Dist.).

{¶ 39} In light of the foregoing, CCRCC's suspension of Hicks from participating in the CCRCC's political functions involved the internal affairs of a political party and we decline to intercede. Hicks' second assignment of error is overruled.

{¶ 40} Assignment of Error No. 5:

THE COURT ERRED BY HOLDING THAT ADOPTED GOVERNING DOCUMENTS, PER R.C. 3517.02, CREATE NO OBLIGATION THAT THEY BE FOLLOWED.

{¶ 41} Assignment of Error No. 7:

THE TRIAL COURT ABUSED ITS DISCRETION IN MULTIPLE WAYS THAT WERE PREJUDICIAL TO THE APPELLANT.

{¶ 42} In his fifth and seventh assignments of error, Hicks ostensibly challenges the trial court's decision granting CCRCC's Civ.R. 12(C) motion for judgment on the pleadings and dismissing Hicks' complaint. Hicks raises five issues for review under his seventh assignment of error: the trial court abused its discretion when it (1) treated Corcoran's and Baxter's testimony at the January 31, 2024 preliminary injunction hearing as settled law, (2) issued a scheduling order with past dates, (3) allowed CCRCC's motion for judgment on the pleadings, (4) disallowed Hicks from moving for summary judgment, and (5) "us[ed] the MJP 'approach' as a means to block consideration of any evidence that would impeach the January 31, 2024 testimony."

{¶ 43} "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Civ.R. 12(C). A court of appeals reviews a trial court's decision on a Civ.R. 12(C) motion for judgment on the pleadings de novo. *Elboco Ents. v. Billman*, 2020-Ohio-4877, ¶ 18.

{¶ 44} "Civ.R. 12(C) motions are specifically for resolving questions of law." *State ex rel. Midwest Pride IV, Inc. v. Pontious*, 1996-Ohio-459, ¶ 21. "Under Civ.R. 12(C), dismissal is appropriate where a court (1) construes the material allegations in the

complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party as true, and (2) finds beyond doubt, that the plaintiff could prove no sets of facts in support of his claim that would entitle him to relief." *Id.* Civ.R. 12(C) requires a determination that no material factual issues exist and that the movant is entitled to judgment as a matter of law. *Id.*

{¶ 45} In his fifth assignment of error, Hicks asserts that notwithstanding Corcoran's and Baxter's testimony at the January 31, 2024 preliminary injunction hearing that CCRCC's governing documents allowed their actions against Hicks, CCRCC has failed to follow such documents. However, Hicks does not identify any specific failure and his only suggestion of noncompliance is the hypothetical reference, "Imagine 'governing documents' that require meeting notice to members and 'party bosses' only, providing notice to 'good' members." Rather, Hicks' fifth assignment of error focuses on the trial court's failure to consider the affidavits of five committee members Hicks attached to his reply to the motion for judgment on the pleadings. Each affidavit challenges Corcoran's and Baxter's January 31, 2024 testimony. Likewise, Hicks' first and fifth issues for review under his seventh assignment of error assert that in granting judgment on the pleadings, the trial court improperly treated the foregoing testimony as settled fact and used the "MJP 'approach' as a means to block consideration" of impeaching evidence such as the affidavits of the committee members above.

{¶ 46} Contrary to Hicks' assertion, the trial court's judgment entry granting the Civ.R. 12(C) motion for judgment on the pleadings shows that the trial court did not consider any testimony from the January 31, 2024 preliminary injunction hearing in granting the Civ.R. 12(C) motion and instead properly restricted its consideration to the pleadings. The trial court's brief reference in its summary of the case—that the allegations in Hicks' complaint were the subject of an evidentiary hearing on January 31, 2024 for

purposes of a preliminary injunction, during which "both parties presented evidence supporting and opposing the allegations"—cannot be equated with the trial court considering Corcoran's and Baxter's testimony and treating such testimony as settled law.

{¶ 47} Furthermore, the trial court did not err in not considering the affidavits attached to Hicks' reply to the motion for judgment on the pleadings. In ruling on a Civ.R. 12(C) motion, a court is restricted solely to the allegations in the pleadings. *Peterson v. Teodosio*, 34 Ohio St.2d 161, 166 (1973). A "written instrument" attached to a pleading also qualifies as "part of the pleading for all purposes." Civ.R. 10(C). Pursuant to Civ.R. 7(A), "pleadings" are defined as a complaint, answer, reply to a counterclaim, answer to a cross-claim, third-party complaint, and a third-party answer. Motions, including a motion for a judgment on the pleadings, are not pleadings under Civ.R. 7(A). *Kesler v. JM Harper, L.L.C.*, 2024-Ohio-1575, ¶ 15 (4th Dist.). Hicks did not attach the affidavits to his complaint or move to amend his complaint. Contents of and attachments to a memorandum or document filed in response to a motion are not part of the pleadings. *Inskeep v. W. Res. Transit Auth.*, 2013-Ohio-897, ¶ 30 (7th Dist.). Therefore, the affidavits attached to Hicks' reply to the motion for judgment on the pleadings cannot be considered in a Civ.R. 12(C) motion and were properly disregarded by the trial court. *Id.*

{¶ 48} In his second issue for review, Hicks summarily argues that the trial court erred in "issuing a scheduling order with dates in the past, while the case was on Appeal, that precluded discovery." This issue refers to the trial court's June 14, 2024 amended scheduling order requesting that dispositive motions by any party, including motions for dismissal and summary judgment, be filed on or before May 24, 2024. The language is identical to that used by the trial court in its previous scheduling order, filed on February 13, 2024, and is clearly a clerical error. The record indicates that Hicks emailed the trial judge on June 17, 2024, asking whether counsel for CCRCC had missed the deadline

and whether updates were needed in the order. Dissatisfied with the trial judge's response, Hicks sent him another email and ultimately filed an affidavit of disqualification with the Ohio Supreme Court, seeking to disqualify the trial judge from presiding over the trial court's proceedings due to bias, prejudice, and lack of impartiality. One of the grounds alleged by Hicks was the trial judge's "refusal to clarify errant dates in an order." Hicks' emails were attached to the affidavit as exhibits. The Supreme Court denied Hicks' affidavit of disqualification on July 30, 2024.

{¶ 49} Although Hicks claims that the June 14, 2024 scheduling order precluded discovery, he does not explain how he was prejudiced by the lack of discovery. "The burden of affirmatively demonstrating error on appeal rests with the party asserting error." *Hyden v. Ingram*, 2024-Ohio-4959, ¶ 23 (12th Dist.). It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error. *Id.* An appellate court is not a performing bear, required to dance to each and every tune played on an appeal. *Id.* Moreover, there was no need for discovery because a Civ.R. 12(C) motion for judgment on the pleadings is restricted to the pleadings as defined in Civ.R. 7(A). Therefore, this issue for review lacks merit.

{¶ 50} In his third and fourth issues for review, Hicks summarily argues that the trial court erred when it allowed CCRCC to move for judgment on the pleadings but disallowed him from moving for summary judgment, when the case was far beyond pleadings and the discovery window had closed.

{¶ 51} Hicks filed his complaint on January 4, 2024, and moved for a preliminary injunction 13 days later. CCRCC filed an answer to the complaint on February 5, 2024. With leave of court, CCRCC moved for judgment on the pleadings on September 11, 2024, a month after our opinion in *Hicks I* upholding the trial court's denial of Hicks' motion for a preliminary injunction. In early December 2024, Hicks moved for leave to file a

motion for summary judgment, which was denied by the trial court.

{¶ 52} Civ.R. 12(C) allows the filing of a motion for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." The trial court vacated the trial dates to accommodate consideration of the motion for judgment on the pleadings. In denying leave for Hick to move for summary judgment, the trial court found, inter alia, that a summary judgment motion would be premature because such a motion involves an analysis of the facts of the case based upon affidavits, depositions, and other evidentiary matters, and discovery had not yet occurred. A trial court has the inherent power to control its own docket and the progress of the proceedings in its court. *Christie v. McNeely*, 2024-Ohio-4523, ¶ 32 (12th Dist.). A trial court also has broad discretion over discovery matters. *Mundy v. Centrome, Inc.*, 2024-Ohio-1001, ¶ 17 (12th Dist.). Recognizing the trial court's special expertise and familiarity with case management issues and the court's discretion to manage its own docket, we find the trial court did not abuse its discretion by allowing CCRCC to move for judgment on the pleadings and denying Hicks' request for leave to move for summary judgment. Hicks' third and fourth issues for review lack merit.

{¶ 53} In light of the foregoing, Hicks' fifth and seventh assignments of error are overruled.

{¶ 54} Judgment affirmed.

PIPER, P.J., concurs separately.

SIEBERT, J., dissents in part, concurs in part, and concurs in judgment only in part.

**PIPER, P.J., concurring separately.**

{¶ 55} I concur with our lead opinion and write separately only to address a few of the many frailties perceived in Hicks' arguments. I also find Hicks' invitation to meddle in

the operation of political bodies to be problematic. This is because, despite what the dissent espouses, *Hicks I* was not "clearly wrong" and Hicks' ability to fulfill his statutory responsibilities does not work an "injustice." Furthermore, while it may be appealing, attempting to harmonize statutes that have their own plain meaning when standing alone is misapplied by the dissent in this case.

{¶ 56} Notwithstanding Hicks' protestations otherwise, there is admiration for Hicks' fervor and intense desire to proclaim perceived political bad actors as corrupt. Yet, the law must remain steadfast when the mission becomes warped by a tunnel vision strategy exercising dogmatic pursuit. Hicks defiantly declares that our unanimous judgment in *Hicks I* was an obvious "injustice." Respectfully, yet misguidedly, the reasoning of the dissent agrees with many of Hicks' ill-framed issues and misinformed assertions.

{¶ 57} For example, to avoid the law of the case doctrine, the dissent's reasoning suggests that when Hicks previously appealed our judgment, the Ohio Supreme Court did not intend to decline a final appealable order regarding those issues. This is not an argument Hicks himself made, but regardless, it clearly rests on speculation. The dissent's position admittedly is guided by its own "historical analysis" leading way to an unnecessary statutory interpretation. This is problematic and results in a misconceived conclusion of "injustice." Additionally, within the reasoning provided by the dissent, are pivotal contentions never properly raised by Hicks in his briefing or at argument.[3] This too is problematic.

**Law Of the Case Doctrine Prevents A Second Bite**

---

3. Appellate review does not search out or create arguments not briefed and litigated by the parties. *Ditech Fin., L.L.C. v. Ebbing*, 2019-Ohio-2077, ¶ 18 (12th Dist.). Nor is it within our role to give pro se litigants who elect to represent themselves special or extra assistance in advancing their cause. *Reyes v. Kiwewa*, 2024-Ohio-4524, ¶ 19 (12th Dist.).

**{¶ 58}** "Courts are not hall monitors duty-bound to intervene in every political squabble." *Ohio House Republican Alliance v. Stephens*, 2024-Ohio-3416, ¶ 16 (10th Dist.). This is primarily why courts have a long history of not interfering in the internal affairs of political bodies. *Id.* at ¶ 17.[4]

**{¶ 59}** The dissent's opinion determines our current review is unrestrained by our prior decision in *Hicks I.* Supporting such a determination is the suggestion that "the law-of-the-case doctrine only applies to inferior courts, not reviewing courts." However, while I respect my dissenting colleague's novel approach, it is well established that a reviewing court's decision remains the law of the case for all subsequent proceedings including *both* the trial court and reviewing levels. *State ex rel. Ames v. Portage Cty. Bd. of Commrs.*, 2023-Ohio-3382, ¶ 21, citing, *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984).[5] It clearly cannot be said "the only way" to challenge *Hicks I* was to subsequently raise (a second time) the same issues again in the trial court, have the trial court apply the law of the case (which even the dissent concedes the trial court had to do), and then institute a second appeal raising those issues again. This not only defies the law of the case doctrine, but it also circumscribes finality.[6]

**{¶ 60}** Our dissenting colleague criticizes the Clermont County Republican Central Committee for its "litigation strategy" in raising the law of the case doctrine, reminding the

---

4. While the Ohio Constitution bestows judicial authority, inherent in that authority is the restraint that judicial action is governed by standards and the rule of law. *Ohio House Republican Alliance* at ¶ 16.

5. Avoiding the law of the case and analyzing a second time our prior decision is *not* "the only way to avoid injustice" as the dissenting opinion proclaims. Hicks previously had a way to challenge our prior decision by way of an appeal to the Ohio Supreme Court. His current attempt is akin to a collateral attack on an otherwise final judgment. It's an attempt at a second bite to reverse a decision that didn't go his way.

6. Res judicata protects the finality of a decision and prevents parties from relitigating the same issue that has already been decided in a final appealable order deterring vexatious litigation and allowing courts to resolve other disputes. *AJZ's Hauling, LLC. v. TruNorth Warranty Program of N. Am.*, 2023-Ohio-3097, ¶ 15. The firmly rooted doctrine the of the law of the case protects those same interests and should not be uprooted.

reader "reviewing courts typically have the authority to re-examine their own decisions, when justified."[7] The dissent is correct that stare decisis does not prevent us from overruling a previous decision. However, the law of the case does not address past precedent, it addresses the law *in the same case*. The dissent's pronouncement of "when justified," is without parameters and not a workable standard; it merely acts as a conduit to express disagreement with the law of the case. Declaring a justification exists is not a standard of review or rule of law. *See Ohio House Republican Alliance*, 2024-Ohio-3416 at ¶ 16, citing *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004).

{¶ 61} Hicks' argument leaves us with this: if the same parties relitigate on remand the same issues, and the trial court correctly applies the law of the case, the losing party can attack the law of the case by instituting a second appeal and simply reargue that prior issues were decided wrongly. Such a procedure is neither encouraged nor supported by the law.

### Presumption the Legislature Knows What It Enacted

{¶ 62} The canon of in pari materia is used sparingly by the judiciary and only when necessary to resolve an ambiguity or resolve an inconsistency.[8] The canon instructs that statutes relating *to the same subject* be read together so that an inconsistency in one statute may be resolved by wording of the other statute *on the same subject*. *Thomas v. Logue, Admr. of Ohio Bur. of Workers' Comp.*, 2022-Ohio-1603, ¶ 26 (10th Dist.). "We 'do

---

7. The word "typically" is much like the word "ordinarily," which the dissent focused on as if it created an exception to the law of the case doctrine. *Ordinarily* the law of the case is controlling upon the reviewing court *unless* on remand the subsequent proceedings involved new evidence or different legal issues. *Vonderhaar v. Cincinnati,* 2010-Ohio-6289, ¶ 13 (1st Dist.). We must not speculate the word "ordinarily" was an authorization for courts to justify an exception to the law of the case doctrine.

8. "The preeminent canon of statutory interpretation requires a court to presume that [the] legislature 'says in a statute what it means and means in a statute what it says there.'" *Castner v. Jefferson Cty.*, 2025-Ohio-1309, ¶ 34 (7th Dist.), citing *BedRoc Ltd., LLC. v. United States,* 541 U.S. 176, 183 (2004), quoting *Connecticut Natl. Bank v. Germain*, 503 U.S. 249, 253-254 (1992).

not have the authority' to dig deeper than the plain meaning of an unambiguous statute under the guise of either statutory interpretation or liberal construction." *Jacobson v. Kaforey*, 2016-Ohio-8434, ¶ 8 (Kennedy, C.J., dissenting joined by Fisher, J. and DeWine, J.), quoting *Morgan v. Ohio Adult Parole Auth.*, 68 Ohio St.3d 344, 347 (1994). Where the role of the state in governing political bodies is limited, and the statutes enacted are clear and unambiguous, there is no need for statutory interpretation. The legislature knows what it enacted. Such is the case here.

{¶ 63} Our dissenting colleague uses the statutory-construction canon of in pari materia to "harmonize" statutes, citing as authority the Ohio Supreme Court's decision in *Snodgrass v. Harris,* 2024-Ohio-3130. However, in *Snodgrass*, Justice DeWine only employed the canon because, "we cannot read either statute standing alone because they point in opposite directions." *Id.* at ¶ 18. Those are not the circumstances herein. Standing alone or together, R.C. 3517.05, 3517.03, and 3517.02 are not ambiguous.[9] Bear in mind the statutes contested here involve separate subject matter: a *public* body filling a seat by *election* vs. a *political* body filling a vacancy by *appointment*.

{¶ 64} To be a member of a political party an individual must be a "qualified elector" (a person who can vote in the general and primary elections). R.C. 3501.01(N). R.C. 3517.02 only pertains to those being "elected;" it does not pertain to those being appointed due to a precinct vacancy. In forming a central committee each precinct can have a member (whether elected or appointed) designated to be from each precinct. R.C. 3517.03. There is no inconsistency within any particular statute at play.

{¶ 65} The dissent extrapolates that because a member running on a ballot to be

---

9. As Justice Fisher indicated in his dissent, and in which Chief Justice Kennedy concurred, the role of the court is to apply each statute as written even if some other approach might make good policy. *Snodgrass* at ¶ 57.

*elected* (by the party at large) must "reside in" the precinct they seek to represent, it then must mean an appointed individual must also "reside in" the precinct to which they are appointed (by the controlling body). However, there is no residency requirement *for an appointment*.[10] In essence, the dissenting opinion asks the judiciary to insert "reside in" to create a precinct residency requirement when the governing body fills a vacancy. The act of legislating judicially is not within our authority. *Bayer v. Am. Ship Bldg. Co.*, 79 Ohio App. 450, 455 (8th Dist.1946). The duty of courts is not to write the law even if improved or for a better purpose or policy.

{¶ 66} Hicks claims the word "from," referenced in R.C. 3517.03, can only mean "reside in." The legislature could have said "reside in," but it did not. The reason is clear. Some rural communities and some municipalities possess precincts in which no one wants to be on a ballot and get elected. Yet the political body should not be diminished from a lack of filled precincts—thus the ability to appoint an individual, a party member, to be "from" or "of" the vacant precinct.[11]

{¶ 67} The dissenting opinion takes creative liberties with the word "chosen" as found in R.C. 3517.05 by suggesting it too must mean appointments have an intended residency requirement. However, that statute has no such intended residency requirement. R.C. 3517.05 states:

> In the case of vacancies caused by death, resignation, failure to elect, or removal from the precinct . . . from which a committeeman was chosen, the controlling committee . . . shall fill the vacancy for the unexpired term.

---

10. Hicks has not proposed that the bylaws have a residency requirement for appointments. "The appointment of political committee members and proposed changes to a county central committee's by-laws are not matters over which the government has control, supervision, jurisdiction, or power." *Jones v. Geauga Cty Republican Party Cent. Commt.,* 2017-Ohio-2930, ¶ 38 (11th Dist.).

11. "From" is a versatile preposition often replaced with words like "of." When considering the context and evident purpose of the statute there is no ambiguity or inconsistency in need of judicial intervention into internal politics. "[C]ourts look not to words or phrases in isolation but to the whole text." *Corder v. Ohio Edison Co.*, 2024-Ohio-5432, ¶ 14. And the possibility of more than one reasonable interpretation of the text does not mean the statute is ambiguous. *Id*.

{¶ 68} It simply does not matter whether the person originally "chosen" was selected by election or appointment, the previously occupied-now vacant seat is to be filled. Thus, given its plain language, even if it could have been articulated better, the statute provides that when an event occurs, such as death, an empty precinct can be filled. Given the statute's clear function, there is no need for judicial intervention to provide a different meaning by looking at a different statute with a different purpose. *See State ex rel. Herman v. Klopfleisch*, 72 Ohio St.3d 581, 585 (1995) (the canon in pari material gives force and effect to each statute).

## Conclusion

{¶ 69} The reasoning of the dissent strings together pearls of black letter law on a strand of frail contentions. The law of the case doctrine applies without the need to create an ambiguity or complexity. Furthermore, even if one disagrees with this court's unanimous judgment in *Hicks I,* it was not "clearly wrong." Additionally, Hicks' ability to fulfill his statutory responsibilities does not work an impending "injustice." Moreover, creating a forced harmony among statutes pertaining to separate subjects is ill-conceived. Therefore, for these reasons, I write separately with complete support of my concurrence with our lead opinion.

**SIEBERT, J., dissenting in part, concurring in part, and concurring in judgment only in part.**

{¶ 70} This is, and always has been, a simple case of statutory interpretation and a request for injunctive relief. Both the trial court and this court made errors in statutory interpretation in *Hicks I*. I think those erroneous interpretations led to a resolution that is not only contrary to law, but also to an unjust result. I respectfully dissent from the majority opinion as it concerns the CCRCC's authority to (1) appoint members who do not live in

the relevant precinct to vacant central committee seats; and (2) indefinitely suspend a duly elected or legally appointed member from the political functions inherent in that member's role. (Assignment of Error Nos.1-4).

{¶ 71} I concur in judgment only as it relates to the need to define "statutory functions" (Assignment of Error No. 6). I concur with the majority as it relates to the CCRCC's governing documents (Assignment of Error No. 5). I also concur with the majority's opinion that the trial court did not abuse its discretion on the motion for judgment on the pleadings because the decision was consistent with *Hicks I*. (No. 7). However, because I respectfully dissent and would sustain Assignment of Error Nos. 1-4, I would reverse and remand to the trial court for further proceedings consistent with this dissent.

## I.  Law and Analysis

### A.  Law of the Case

{¶ 72} As the majority correctly notes, the law-of-the-case doctrine provides that the "decision of a reviewing court in a case remains the law of the case on legal questions involved for all subsequent proceedings." *Giancola*, 2018-Ohio-1694, at ¶ 14, citing *Nolan v. Nolan*, 11 Ohio St. 3d 1, 3 (1984). The doctrine is based on the sound principles noted by the majority, such as avoiding endless litigation and preserving the structure of inferior and superior courts. But the doctrine and its underlying principles have limits, which apply to the question of when a reviewing court may or may not re-examine its own prior decision. Because this case is outside the limits of both the doctrine and the precedent set by the Supreme Court of Ohio, I would decline to apply it here and would re-examine *Hicks I*.

{¶ 73} Some historical analysis of the relevant case law on the law-of-the-case doctrine supports not applying this doctrine here. Many Ohio cases state that the doctrine

applies to "legal questions involved for all subsequent proceedings in the case *at both the trial and reviewing levels*" by citing or quoting *Nolan* at 3. (Emphasis added.) *See, e.g., State ex rel. Mather v. Oda*, 2023-Ohio-3907, ¶ 19. But the application of the law-of-the-case doctrine to *reviewing* courts is not *Nolan*'s controlling pronouncement of law.

### Syllabus Rule

{¶ 74}  The "Syllabus Rule" applied to *Nolan*. In short, the Syllabus Rule mandated that, "'[o]nly what is stated in a syllabus or in an opinion *per curiam* or by the court represents a pronouncement of the law by this court.'" *LGR Realty, Inc. v. Frank & London Ins. Agency*, 2018-Ohio-334 ¶ 18, quoting *State ex rel. Canada v. Phillips*, 168 Ohio St. 191 (1958), paragraph six of the syllabus. When *Nolan* issued, the Supreme Court's Reporting Rules affirmed the "Syllabus of Supreme Court opinion states the controlling point(s) of law decided in and necessarily arising from the facts of the specific case." Rep.Op.R. 1(B) (1983).[12] Therefore, only the conclusions of law found in *Nolan*'s syllabus control.

### Law-of-the-Case Doctrine – Inferior Courts

{¶ 75}  *Nolan'*s syllabus held only that "[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an *inferior* court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." (Emphasis added.) *Nolan* at paragraph one of syllabus. Only *Nolan*'s non-controlling language applies the law-of-the-case doctrine to a *reviewing* court. (Emphasis added.) *See Id.* at 5. Further, the law *Nolan* relied upon for its application of the doctrine to a reviewing court

---

12. On May 1, 2002, the Supreme Court modified the Syllabus Rule: "The law stated in a Supreme Court opinion is contained within its syllabus (if one is provided), and its text, including footnotes." Rep.Op.R. 1(B) (2002). If disharmony between syllabus and text or footnotes of Supreme Court opinion, the syllabus controls. *Id*. On July 1, 2012, the Syllabus Rule ended by the adoption of Rep.Op.R. 2.2 ("The law stated in an opinion of the Supreme Court shall be contained in its text, including its syllabus, if one is provided, and footnotes.").

was itself overruled almost fifty years prior. *See Id.*, citing *Gohman v. St. Bernard*, 111 Ohio St. 726, 730 (1924), paragraphs one and two of the syllabus, *overruled by N.Y. Life Ins. Co. v. Hosbrook*, 130 Ohio St. 101 (1935), paragraph two of the syllabus. So, has the Supreme Court issued a mandate here? The majority answers "yes." I disagree.

### Law-of-the-Case Doctrine – Reviewing Courts

{¶ 76} The majority relies on three cases to foreclose the possibility this court can re-examine its opinion in *Hicks I. Sheaffer v. Westfield Ins. Co.*, 2006-Ohio-4476, ¶ 16 (holding its "denial of jurisdiction over a discretionary appeal settles the issue of law appealed"); *see also Hubbard ex rel. Creed v. Sauline*, 1996-Ohio-174, ¶ 14[13]; *Musial Offices, Ltd. v. Cuyahoga Cty.*, 2022-Ohio-1944, ¶ 15 (8th Dist.). But the procedural posture of this case is markedly different than *Sheaffer*, *Hubbard*, and *Musial*, and that difference seems not only relevant, but also critical enough to reject its application here.[14]

{¶ 77} *Musial* involved a bench trial for a class action related to property tax overpayments upon a *fifth* appellate review. *Musial* at ¶ 2. *Seaffer* and *Hubbard* both involved the Supreme Court's application of the doctrine after complex procedural histories involving decisions on summary judgment. *See generally Seaffer; see also Hubbard*, paragraphs 8-10 of the syllabus.

{¶ 78} *Seaffer* emphasized the Court based its preclusion of a retrospective application of a change in the law "on the unique facts of this case." *Seaffer* at ¶ 2. And three Justices issued a strong dissent in *Seaffer*, questioning the doctrine's application to the case when the change in law occurred before rights vested in the plaintiffs. *Id.* at ¶ 21

---

13.The Syllabus Rule applies to *Hubbard. See supra*, ¶ 4, *Hubbard* did discuss the law-of-the-case doctrine as it relates to reviewing courts in its non-controlling opinion (relying on the non-controlling language of *Nolan*). But *Hubbard*'s controlling syllabus does not mention the doctrine at all. *Hubbard*, paragraph one of syllabus (noting only its holding regarding legal duty to repay compensation paid in error).

14. If the Supreme Court finds *Sheaffer* foreclosed our re-examination of *Hicks I*, the Court should consider the *Hicks I* substantive analysis as in support of a concurrence in judgment only of the majority opinion.

(Lundberg Stratton, J., dissenting). The reasoning used in *Seaffer* (both the majority and dissent) shows the critical nature of the difference between a case appealed after trial or summary judgment and an interlocutory appeal at issue here.

**{¶ 79}** This court held the trial court's order denying a preliminary injunction was a final appealable order pursuant to R.C. 2505.02(B)(4), *Hicks I*, 2024-Ohio-3049, at ¶ 14. But that decision does not itself prevent this appeal, and the procedural history of this case after *Hicks I* supports that reasoning. The Supreme Court denied Hicks' discretionary appeal. *Hicks v. Clermont Cty. Republican Cent. Commt.*, 2024-Ohio-5529 (appeal not accepted for review). But the CCRCC's opposition to Hicks' discretionary appeal focused almost entirely on its interlocutory nature. *Hicks. v. Clermont County Republican Central Committee, et al.*, Case No. 2024-1296, Mem. Opp'n 6-8 (urging jurisdictional denial based on "interlocutory" nature of preliminary injunction and no trial court ruling on "ultimate request for a permanent injunction"). The CCRCC did not offer any substantive opposition to Hicks' propositions of law. Instead, it incorporated this Court's *Hicks I* opinion by reference, asserting, "it was correct in its conclusions of law." *Id.* at 10. The CCRCC's opposition arguments support the view that the Supreme Court's denial could have focused on the interlocutory nature of the appeal instead of the substance[15], so that the case and record could receive the benefit of further development.

**{¶ 80}** After the Supreme Court's jurisdictional denial, the CCRCC filed for a motion for judgment on the pleadings in the trial court, instead of seeking a ruling on "the ultimate request for a permanent injunction." The CCRCC now relies on the law-of-the-case doctrine to foreclose this court's re-examination of its opinion issued after the denial of a

---

15. Admittedly, the jurisdictional denial could also have focused on the substance of *Hicks I*. Since the Court's reasoning is speculative either way, foreclosing our further review based on the jurisdictional denial seems particularly problematic here.

preliminary injunction. This seems to be a heads I win, tails you lose litigation strategy. But reviewing courts typically have the authority to re-examine their own decisions, when justified.

{¶ 81} The Supreme Court of the United States recognized the law-of-the-case doctrine is not a limit on a reviewing court's power to reconsider its earlier decision if the court is convinced it was "clearly erroneous and would work a manifest injustice." *Agostini v. Felton*, 521 U.S. 203, 236 (1997). Indeed, Justices on Ohio's Supreme Court have noted it would make "little sense" to say the court has the authority to overrule its prior precedent by reconsidering its own decisions but "somehow lacks the authority to correct an obvious error it made at an earlier stage in a case." *State ex rel. Ames v. Portage Cty. Bd. of Commrs.*, 2023-Ohio-3382, ¶ 69 (J. DeWine, dissenting). Courts of appeals have also recognized this exception to the law-of-the-case doctrine by re-examining law of the case "'[they themselves] previously created, if that is the only means to avoid injustice.'" *State v. Bates*, 2019-Ohio-1172, ¶ 15 (10th Dist.), quoting *State v. Monroe*, 2015-Ohio-844, ¶ 30 (10th Dist.). *See also State v. I'Juju*, 2016-Ohio-3078, ¶ 11 (10th Dist.); *Koss v. Kroger Co.*, 2008-Ohio-2696, ¶ 19 (10th Dist.); *Pavlides v. Niles Gun Show*, 112 Ohio App.3d 609, 615 (5th Dist.1996); *Weaver v. Motorists Mut. Ins. Co.*, 68 Ohio App.3d 547, 549 (2d Dist.1990).

{¶ 82} *Nolan*'s controlling holding on the law-of-the-case doctrine only applies to inferior courts, not reviewing courts. *Sheaffer*, *Hubbard*, and *Musial* involved markedly different procedural postures from this case. The CCRCC's reliance on the interlocutory nature of Hicks' jurisdictional appeal in its opposition to that appeal supports a conclusion that the Supreme Court's denial could have focused on that interlocutory nature, rather than the substance of *Hicks I*. Because of these procedural differences, because this court's opinion in *Hicks I* was clearly wrong, and because re-examining that opinion is the

only way to avoid injustice, I would not apply the law-of-the-case doctrine. I would instead apply the *Agostini* line of reasoning and would re-examine *Hicks I*.[16]

## B. Judicial Intervention on "Internal Affairs" of Political Parties

{¶ 83} The CCRCC argues that "Hicks is asking this Court to do what the First Amendment and established legal precedent forbid it from doing." Not so. This is a simple case of statutory interpretation and a request for injunctive relief. The Ohio Constitution vests the exercise of judicial power in the courts. Ohio Const., art. IV, § 18. The exercise of that authority includes interpreting laws the General Assembly enacts to "give effect to the intent of the legislature." *State v. Taylor*, 2014-Ohio-460, ¶ 14. A court must "engage in a balancing process designed to weigh the inequities between the parties in determining whether or not injunctive relief is appropriate." (Cleaned up.) *Hicks I,* 2024-Ohio-3049, at ¶ 27.

{¶ 84} The CCRCC is correct that a political party has a right to the freedom of association protected by the First Amendment, and that the State (via the courts) may not intercede in the internal affairs of the CCRCC because of that right. But the CCRCC misapplies the relevant case law supporting this principle—none of the case law cited prevents this court from providing injunctive relief if it finds the CCRCC acted contrary to an unchallenged law.

### Federal Case Law

{¶ 85} The federal cases the CCRCC relies upon involve cases in which a political party (or its representatives) *challenged the constitutionality of a state law* that somehow restricted internal party operations. *See Heitmanis v. Austin*, 899 F.2d 521 (6th Cir. 1990)

---

16. The law-of-the-case doctrine does not apply to Hicks' Assignment of Error 2 (court erred in inventing "bifurcated" central committee participation). I dissent from the majority's opinion regarding this assigned error and include it in the analysis under Section D.

(challenging Michigan law granting automatic delegate status to certain individuals contradicting national party rules); *Democratic Party of U. S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107 (1981) (challenging Wisconsin statutory mandate requiring results of primary election determine delegates to party national convention); *Eu v. San Francisco Cty. Democratic Cent. Commt.*, 489 U.S. 214 (1989) (challenging California statutes preventing candidate endorsements, dictating organization and composition of party's governing bodies, limiting terms of office for party committees, and requiring geographical rotation for party chairs).

{¶ 86} In all these cases, the Court balanced the burden on the political party's First Amendment rights against the State's interest in regulating elections. Within the context of finding the relevant laws unconstitutional, the Court reasoned the *laws improperly invaded* internal political party matters and acknowledged it could not do so either (by upholding unconstitutional laws). The Court did *not* hold that it could not interpret the relevant statutes or the Constitution for fear of improperly invading party politics.

{¶ 87} Hicks asked this court to interpret a statute—whose constitutionality the CCRCC did not challenge—that governs the basic qualifications for elected and appointed central committee members. None of the federal law cited by the CCRCC involved the question of ordinary statutory interpretation of an unchallenged law that applies to a political party, and whether a political party followed that unchallenged law, as interpreted. Nor do they prohibit this court from doing so. Likewise, the Ohio cases the CCRCC relies upon for its arguments against judicial intervention are not dispositive here, and the controlling law from the cases it cites supports *Hicks'* argument that a member of a county central committee is a "public officer."

**Ohio Case Law**

{¶ 88} A claimant in a quo warranto action challenged the constitutional authority of the General Assembly to authorize county central committees to fill a vacancy in an elective county office. *State ex rel. Hayes v. Jennings*, 173 Ohio St. 370 (1962). ("*Hayes*"). Since this opinion was issued in 1962, only the syllabus is the controlling law of this case. *See*, ¶ 74 above. The Supreme Court held that the authorization to fill vacancies, "confer[s] official power upon the members of the central committee, and *this annexation of power to this position makes it a public office* and is a constitutional grant of power by the General Assembly." (Emphasis added.) *Id*., at paragraph one of the syllabus. Simply put, *the General Assembly's action* (granting appointment power) defined the county central committee as a "public office." The *county central committee's exertion* of this granted power *is not* what defines it as a public office.

{¶ 89} The Supreme Court addressed a slightly different question during another quo warranto action brought against the chair of the *state* central committee. *State ex rel. Cain v. Kay*, 38 Ohio St.2d 15 (1974) ("*Kay*"), paragraph one of the syllabus (denying writ of quo warranto against state committee chair) (again, only the syllabus controls). *Kay* does not limit this court from considering the questions before it. The Court only reasoned that since a quo warranto action requires a claimant to show the case involves a "public office," the Court had to determine whether the state central committee chair was a public office before it could intervene "for the purposes of quo warranto." *Id*. at 19. Nor did *Kay* overturn or limit the holding in *Hayes*. *Kay* simply reasoned since the General Assembly did not grant official power to the *state* central committee chair, it was not a "public office" and denied the writ of quo warranto.

{¶ 90} The CCRCC asserts that two Eleventh District cases support its argument that this court would be impermissibly "interven[ing] in the internal affairs of a political

party" if it afforded Hicks relief. Three problems exist within the CCRCC's assertion: (1) the Eleventh District is not binding upon this court; (2) the cases commend, rather than limit, the holdings of *Hayes* and *Kay*; and (3) the context of the cases are inapossite to Hicks' claims.

{¶ 91} The Eleventh District analyzed whether public meeting laws apply when a county central committee meets only to conduct internal political functions. *Jones v. Geauga Cty. Republican Party Cent. Commt.*, 2017-Ohio-2930, ¶ 35 (11th Dist.); *Ames v. Geauga Cty. Republican Cent. Commt.*, 2023-Ohio-3689, ¶ 31 (11th Dist.). They both acknowledged *Hayes* and *Kay* held the members of a county central committee are "public officers" by virtue of their appointment power. But the courts found central committee members are not "public officials" engaged in "public meetings" concerning "public business" when they are addressing the internal affairs of the political party, and the public meeting laws did not apply on those occasions. *See Id*.

{¶ 92} The courts in *Jones* and *Ames* did not interpret an unchallenged statute directly governing qualifications for central committee membership. They engaged in regular statutory interpretation of these public meeting laws to reach their conclusions. This court should do the same with the statutes directly tied to defining county central committee membership qualifications.

{¶ 93} The CCRCC's argument that the First Amendment and legal precedent forbid this court from resolving Hicks' claims because they only involve "internal" political matters lacks merit.

## C. Non-Precinct-Resident-Appointees

{¶ 94} Hicks raises several assignments of error[17] that all relate to the same non-

---

17. Assignment of Error 1 (error based on Ohio Const., art. XV, § 4.9); Assignment of Error 3 (error based on application of R.C. 3517.05 "removal" clause to appointed members); Assignment of Error 4 (error based

precinct-resident-appointees question: whether an appointee to a vacant committee member seat must be a resident of the precinct they would represent if appointed. In *Hicks I*, this court—like the trial court below—found that R.C. 3517.05 ("Vacancy Appointment Statute") contains "no statutory residency requirement for committeepersons who are voted in to fill vacancies" by a central committee. *Hicks I*, 2024-Ohio-3049, at ¶ 21. Since the CCRCC's Constitution gave preference to residents of the precinct at issue before allowing for non-precinct-resident appointments, and the Vacancy Appointment Statute does not contain a residency requirement, this court found no error. *Id*. at ¶ 23.

{¶ 95} The concurring opinion in *Hicks I* disagreed, finding the Vacancy Appointment Statute requires an appointee to be subject to the same residency requirement contained in R.C. 3517.02 ("Member Election Statute"). *Id*. at ¶ 35 (J. M. Powell, concurring). But the concurrence found this error harmless because "the CCRCC permits a non-precinct-resident-appointee to participate only in the internal affairs of the committee. In this sense, the appointment is nominal and does not fill the vacancy as related to the committee's statutory responsibilities." *Id*. at ¶ 36.

{¶ 96} I agree with the concurrence's statutory interpretation of the Vacancy Appointment Statute in *Hicks I*, but I do not find the error harmless, regardless of the CCRCC's limitation of participation of such non-precinct-resident-appointees to "internal affairs" of the CCRCC.

### 1.  Statutory Interpretation Clearly Wrong

{¶ 97} The *Hicks I* opinion correctly found abuse of discretion is the standard of review for the trial court's analysis of the preliminary injunction factors. *Freeman Indus.*

---

on statutory requirement that central committee can only have one member "from" any given precinct). These assignments of error are all addressed within this section.

*Prods., LLC. v. Armor Metal Group Acquisitions, Inc.,* 2011-Ohio-1995, ¶ 17, 952 (12th Dist.). But "[c]ourts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38-39. We review questions of statutory interpretation de novo. *Wayt v. DHSC, L.L.C.*, 2018-Ohio-4822, ¶ 15. Although not explicit, this court did conduct a de novo review of some of the relevant statutory framework in *Hicks I. See* at ¶ 21, 24. However, it did not analyze all relevant statutes and erred in its interpretation of the statutes analyzed.

{¶ 98} The Member Election Statute states, "[e]ach member of a controlling committee shall be a resident and qualified elector of the district, ward, or precinct that the member is elected to represent." R.C. 3517.02.

{¶ 99} The "Controlling Committee Statute" states, "[t]he controlling committees of each major political party . . . shall be . . . a county central committee consisting of one member from each election precinct in the county." R.C. 3517.03. Hicks asserted in *Hicks I* and here that CCRCC violated the Controlling Committee Statute by appointing non-precinct-resident-appointees. If Precinct A elected a member from the precinct, but then the central committee appoints a different person who lives in Precinct A to fill a vacancy in Precinct B, then the central committee would have two members "from" Precinct A. Hicks alleges over 30 such instances exist on the CCRCC. This court acknowledged Hicks asserted this argument but conducted no statutory interpretation of the Controlling Committee Statute. *Hicks I,* at ¶ 20.

{¶ 100} The Vacancy Appointment Statute states, "[i]n case of vacancies caused by death, resignation, failure to elect, or removal from the precinct . . . from which a committeeman was chosen, the controlling committee or, if authorized, the executive committee shall fill the vacancy for the unexpired term by a majority vote of the members

of such committee." R.C. 3517.05.

{¶ 101} While it is true that the Vacancy Appointment Statute contains no residency requirement, that is not the end of the statutory interpretation question. Statutes relating to the same subject matter should be "construed harmoniously," if possible. *Snodgrass v. Harris*, 2024-Ohio-3130, ¶ 17, citing Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 252-255 (2012).

{¶ 102} Here, the same chapter of the Ohio Revised Code includes the Member Election Statute, the Controlling Committee Statute, and the Vacancy Appointment Statute. All three statutes relate to the same subject matter—the qualifications for central committee membership and filling those member seats through either election or appointment. These statutes would be inharmonious, at best, and completely illogical, at worst, if interpreted according to the majority opinion in *Hicks I*.

{¶ 103} A candidate for central committee member can only run for election if he or she is a "resident and qualified elector" in the relevant precinct. R.C. 3517.02. The central committee "shall" consist of one member "from" each precinct. R.C. 3517.03. A member "removing" (or moving away from), the precinct from which that member was "*chosen*" "causes" a vacancy of a central committee seat. (Emphasis added.) R.C. 3517.05. This court cannot construe these statutes "harmoniously" by finding they require residency for an elected central committee member but not an appointed member. Such appointment would almost assuredly lead to more than one member "from" various precincts (as Hicks alleges is exactly what happened in the CCRCC). The appointment of a central committee member who does not live in the precinct would, by virtue of the plain language of the Vacancy Appointment Statute itself, cause a "vacancy" of that same seat. This court should not use this kind of circular logic when construing these two statutes together. Further, the language of the Vacancy Appointment Statute plainly

applies to both elected and appointed members.

{¶ 104} The Vacancy Appointment Statute applies the causes of vacancy to any central committee seat "from which a committeeman was *chosen*." The Vacancy Appointment Statute does not say the causes of vacancy only apply to any seat "from which a committeeman was *elected*." Under the statutory scheme of Chapter 3517, central committee members are "chosen" in exactly two ways: election or appointment by the relevant controlling committee. R.C. 3517.02 and 3517.05. Therefore, the causes of vacancy, including "removing" from the relevant precinct, apply broadly to elected and appointed members. Non-precinct-resident-appointees cause a vacancy under this statute. The cure cannot cause the illness.

{¶ 105} Hicks also raises an argument based in the Ohio Constitution, which states, "[n]o person shall be elected or appointed to any office in this state unless possessed of the qualifications of an elector." Const. art. XV, § 4. This court held that central committee members do not hold an "office" within the meaning of this constitutional provision because various statutory provisions within the Ohio Revised Code exclude central committee members from the definition of "public office." *Hicks I*, at ¶ 24. Under the principle of constitutional avoidance, courts do not decide constitutional questions unless it is necessary to do so. *Epcon Communities Franchising, L.L.C. v. Wilcox Dev. Group, L.L.C.*, 2024-Ohio-4989, ¶ 2. Since the statutory interpretation leads to the conclusion that the trial court and this court erred in its analysis in *Hicks I*, this court would not normally address the constitutional argument. However, since the majority in *Hicks I* chose to analyze the question, this dissent does as well.

{¶ 106} First, the constitutional provision does not use the term "public office"; it uses "office." Many sources of authority equate the two terms, most without any explanation. *See, e.g.,* 1992 Ohio Atty.Gen.Ops. No. 008; 1993 Ohio Atty.Gen.Ops. No.

013. The definition of "public office" excludes "offices of a political party" for the purposes of Ohio's campaign finance laws and Ohio's Ethics Laws. R.C. 3517.01(C)(9)(13) ("as used in this section"); R.C. 102.01(B)(1) ("as used in this chapter"). By the plain language in these statutes, these exclusions only apply in those statutory contexts; they do not apply broadly in all contexts.

{¶ 107}  But *Hayes* defined the county central committees as "public offices" by virtue of the General Assembly granting them appointment power. *Hayes*, 173 Ohio St. 370, at paragraph one of the syllabus. The statutory exclusion of "offices of a political party" from the definition of "public office" is limited to specific statutory chapters and sections, and *Hayes*' inclusion of central committee members within the definition of "public office" contains no such limitation. Therefore, under the Ohio Constitution, central committees must follow precinct residency requirements found in the Member Election Statute when appointing people to fill vacancies.

{¶ 108}  As a matter of statutory interpretation, the Vacancy Appointment Statute does not allow a county central committee to fill vacancies with non-precinct-resident-appointees. Likewise, the Ohio Constitution prohibits non-precinct-resident-appointees. Because this error of interpretation affected the balance of harms related to Hicks' claims, the error was not harmless.

## 2.  Error of Interpretation Created Injustice

{¶ 109}  As the CCRCC correctly argues, political parties have a First Amendment right to the freedom of association that must be protected—that is why courts analyzing a political party's constitutional challenge to a state's election laws apply strict scrutiny and require the state to show a compelling interest justifying the laws when balanced against the party's rights. *See generally Eu*, 489 U.S. 214. But no one alleges the statutes

at issue are unconstitutional, so the court does not evaluate the State's interests. Rather, the court must balance the relative harm to the parties if it grants injunctive relief.

{¶ 110} The party alleges it must be able to provide rules for its own internal governance, and a court's intervention via injunction against its rule allowing for non-precinct-resident-appointees would irreparably harm it by intruding on its First Amendment right to association. A statute is presumed to be constitutional and "courts have a duty to liberally construe statutes in order to save them from constitutional infirmities." *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 2010-Ohio-4908, ¶ 20. The CCRCC does not argue, and so concedes, the constitutionality of the statutory requirements for election of central committee members by primary voters and that they must be residents of the relevant precinct.

{¶ 111} Yet, despite this concession, the CCRCC argues the court "may not dictate or control committeeman appointments," without improperly infringing on its First Amendment rights of association. The CCRCC's argument at least implies that this court could not "intervene" even if the appointed members do not meet the statutory qualifications. Not so.

{¶ 112} A sheriff, appointed by the relevant political party, argued the "determination of qualifications" was a political question for that political party's central committee when appointing a sheriff under R.C. 305.02. *State ex rel. Swanson v. Maier,* 2013-Ohio-4767, ¶ 25. The Supreme Court determined that argument was "without merit" because the General Assembly sets the qualifications for sheriff, which apply even when a political party fills a vacancy under R.C. 305.02. ("Governmental Appointment Statute"). These statutory qualifications exist "outside the sphere" of internal party politics. The same reasoning applies here—the statute authorizes the central committee to appoint members but does not authorize those committees to ignore statutory requirements for

members, which the CCRCC conceded as constitutional.

{¶ 113}   Next, the court must consider what, if any, comparable injuries Hicks would sustain if denied injunctive relief preventing the CCRCC from making non-precinct-resident appointments. *Hicks I*, 2024-Ohio-3049, at ¶ 27. Hicks argues these appointments harm him because they dilute his vote and voice on the CCRCC, as a duly elected member who lives in the precinct that elected him (Union Township "Precinct P1P"). This argument is well-taken.

{¶ 114}   When interpreted properly together, the Member Election Statute, the Vacancy Appointment Statute, and the Controlling Committee Statute support a principle common in our Constitutional Republic: an official represents the people where he or she lives. Why? Because if the people of Clermont County elect Susan to represent them, but she does not live in Clermont County, Susan will have far less relationship to the people she represents. She will not have the kind of intimate knowledge of the challenges they face and the opportunities they want her to advocate for on their behalf.

{¶ 115}   And an "officer of a political party," means a central committee member, whether elected or appointed, who "represent[s]" a precinct of the political party. R.C. 3501.01 ("As used in the sections of the Revised Code relating to elections and political communications"). The Member Election Statute is a section related to elections, so the language defining a member as one who "represents" a precinct applies. Roles differ—a central committee member's role is of a political nature—but the principle of representation rooted in geography applies no matter the role.

{¶ 116}   Several consequences occur when a primary voter from Precinct A is represented by a committee member elected from that precinct and Precinct B is represented from someone appointed by the party who also lives in precinct A. First, Precinct A now has two voices on the committee, instead of one. Yes, the second voice

"represents" precinct B, but there can be no question that the voice still comes "from" precinct A. Second, the people who live in Precinct B have nominal representation but not by someone "from" their precinct. Finally, a duly elected member from Precinct C would also have two voices "from" precinct A to potentially counter. Precinct A has double representation to the extent the non-precinct-resident-appointee to precinct B is a voice for both B, by appointment, and A, by geography. Precinct B has quasi-representation without respect to geography mandated by statute. Precinct C's representation is diluted by facing two voices from A.

{¶ 117} The CCRCC's appointment of non-precinct-resident central committee members violates the Member Election Statute, the Vacancy Appointment Statute, and the Controlling Committee Statute, when interpreted together. Likewise, the Ohio Constitution prohibits appointing people to "offices" who do not meet the qualifications of that office, and the Supreme Court held that central committee members hold "public office." The CCRCC's appointment of non-precinct-residents harmed Hicks, a duly elected member, and by extension the primary voters of Precinct P1P, by diluting their voices with voices of those appointed contrary to statute. These conclusions relate to Hicks' Assignments of Error Numbers 1, 3, and 4. I would sustain these errors.

### D. Hicks' Indefinite Suspension

{¶ 118} Hicks raises two assignments of error in this appeal that relate to the same question: whether the CCRCC had the right to indefinitely suspend Hicks from all political activities and meetings but not from the "statutory" or "governmental" meetings. First, Hicks asserts this court erred by inventing a "bifurcated" central committee participation unsupported by statute. Second, Hicks argues the court erred by citing, but not defining, the "statutory functions" of a central committee. In *Hicks I*, this court held that Hicks'

indefinite suspension did not violate his First Amendment rights to the freedom of speech and the right to peaceably assemble, and he suffered no irreparable harm from this suspension.

{¶ 119} I agree with the holding in *Hicks I* that the CCRCC did not violate Hicks' First Amendment rights when it indefinitely suspended him. As a private organization, the CCRCC is not a state actor when not conducting a meeting pursuant to the Governmental Appointment Statute. Since neither Hicks nor the CCRCC is a state actor, the CCRCC could not have violated Hicks' constitutional rights when it indefinitely suspended him.

{¶ 120} But I disagree with the conclusion that Hicks' *indefinite* suspension caused him no irreparable harm. Although I do so with caution and some caveats, I dissent from the majority's conclusion that Hicks' indefinite suspension from the CCRCC only involved the internal affairs of a political party, and so this court should decline to intercede.

### 1. Indefinite Suspension Interpretation Clearly Wrong

{¶ 121} The General Assembly defined required qualifications for members and the geographic distribution of the central committee members through the Member Election Statute and the Controlling Committee Statute. Likewise, the Vacancy Appointment Statute identified only four ways a vacancy on the central committee occurs: (1) death, (2) resignation, (3) failure to elect, and (4) removal [i.e., moving away from] the precinct. R.C. 3517.05. When a statute includes a series of terms that should be understood to go hand in hand, the series justifies the inference that "items not mentioned were excluded by deliberate choice, not inadvertence." *Summerville v. Forest Park*, 2010-Ohio-6280, ¶ 35, citing *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

{¶ 122} The series of terms in the Vacancy Appointment Statute are all terms related to how a vacancy on a central committee occurs and so should be understood as

going "hand in hand." The Vacancy Appointment Statute does not contain expanding clauses introducing the list, such as "including" or "including, but not limited to." The series of related terms and the lack of any expanding clauses before the series justify inferring that these four, statutorily identified ways a vacancy occurs on a central committee are the *only* four ways to do so.

{¶ 123} The Vacancy Appointment Statute does not include "removal" or "suspension" by the central committee as a reason a vacancy can occur. This exclusion means the central committee does not have the authority to suspend a duly elected or legally appointed member to the extent that suspension creates a vacancy. The CCRCC's indefinite suspension of Hicks created a de facto vacancy contrary to the Vacancy Appointment Statute.

## 2. Indefinite Suspension Created Injustice

{¶ 124} I agree that Hicks' indefinite suspension did not violate his First Amendment rights, but not because he could continue engaging in politics in his precinct. The CCRCC did not violate Hicks' constitutional rights because the CCRCC is not a state actor, except for when it acts according to the Governmental Appointment Statute. However, by indefinitely suspending Hicks and creating a de facto vacancy contrary to the Vacancy Appointment Statute, the CCRCC caused Hicks irreparable harm.

{¶ 125} First—the First Amendment. This court found that because Hicks' indefinite suspension from the CCRCC did not prohibit him from engaging in political activities within Precinct P1P, it did not violate his First Amendment rights. *Hicks I*, 2024-Ohio-3049, at ¶ 25. Of course, Hicks could continue to exercise his individual First Amendment rights—every individual can canvass voters, speak either for or against candidates and issues, and contribute to candidates, regardless of membership on the

CCRCC. *See Id*. Elected or appointed membership status on a central committee does not protect those fundamental rights from *government* infringement—the Constitution does. But Hicks' alleged harms from his indefinite suspension are untethered to his ability to continue to exercise his basic and obvious *individual* First Amendment rights. Nor does Hicks' ability to attend meetings held to fill vacancies in elected offices address his alleged harms.

{¶ 126} This court recognized Hicks' suspension "has not precluded him from participating in the statutorily prescribed, so-called "governmental" functions of the CCRCC," including filling vacancies pursuant to the Governmental Appointment Statute. *Id*. at fn.5. I construe the *Hicks I* opinion and the majority here to mean that the only "statutorily prescribed, so-called 'governmental' functions of the CCRCC" are those times when the CCRCC is acting *in the place of the government*, which is only when the CCRCC acts pursuant to the Governmental Appointment Statute.

{¶ 127} Outside of occasions when the CCRCC *acts in the place of* the county government when it appoints people to vacated elected offices pursuant to the Governmental Appointment Statute, it is not a state actor. This also supports the findings in *Ames* and *Jones* that public meeting laws such as the Open Meetings Act only apply to central committees when they are acting pursuant to the Governmental Appointment Statute.

{¶ 128} Hicks argues that the statutory scheme mandates central committee perform other tasks, such as setting a term of office (R.C. 3517.03), selecting a petition format (R.C. 3513.051 and 3517.03), and appointing to fill vacancies. (R.C. 3513.05). He asserts this court should define these other statutorily mandated functions as "statutory functions," and so the CCRCC cannot prevent him from taking part in those functions under *Hicks I*. While those statutes mandate central committees to take specific actions,

the central committees do not sit *in the place of government* when completing them. The CCRCC is not sitting in the place of the county government when it selects a petition format in the way it is when filling vacancies for county elected offices. Rather, the General Assembly has mandated certain administrative tasks to the internal processes of the central committees, but it does not mandate how or with what qualifications the CCRCC completes those tasks. These statutes contrast with the Member Election Statute (setting residency and elector requirements); the Controlling Committee Statute (setting a limit of one member "from" each precinct); and the Vacancy Appointment Statute (mandating how vacancies occur and that central committees fill those vacancies *by a majority vote*).

{¶ 129} When the CCRCC is not a state actor, it bears no responsibility to follow the First Amendment—the Constitution protects individuals and entities from *government* infringement. *Hall v. Kosei St. Marys Corp.*, 2023-Ohio-2021, ¶ 26 (3rd Dist.), citing *Eastwood Mall, Inc. v. Slanco*, 68 Ohio St.3d 221, 222-223 (1994). Private organizations may prevent people from speaking and other actions that would be subject to First Amendment claims if performed by state actors. I disagree with Hicks' assertion that this court needs to clarify what "statutory functions" meant. When the CCRCC acts pursuant to the Governmental Appointment Statute, it is acting in the place of government. At those times, it must act within the boundaries of the Constitution and any other applicable laws, such as the Open Meetings Act. But CCRCC's exclusion of meetings held pursuant to the Governmental Appointment Statute from Hicks' indefinite suspension, and this court's affirmation of the same, implicitly recognized that the CCRCC does not have the authority to remove a duly elected (or precinct-resident-appointee) member completely. Yet, Hicks' indefinite suspension more than likely did just that.

{¶ 130} Second—the de facto vacancy. This court held that the indefinite suspension from partisan political functions of the CCRCC did not cause Hicks irreparable

harm. *Hicks I*, 2024-Ohio-3049, at ¶ 32. What this court's decision in *Hicks I* did not recognize is that an "indefinite" suspension functionally removed Hicks from vast majority (and most likely all) of the purposes and activities of a duly elected member that will occur during the member's term. Hicks' representation of Precinct P1P largely encompasses two responsibilities: (1) communicate *to the CCRCC*, via his vote and voice as a member, *what the voters in Precinct P1P think* about any number of political questions (what candidate(s) to support, how the party should spend its resources, etc.); and (2) communicate *from the CCRCC to the voters* in Precinct P1P *what decisions the CCRCC made* on those questions. Filling a vacancy for an elected official occurs rarely, if at all, during a term for a member of a party's central committee, but the political responsibilities occur frequently. Hicks' indefinite suspension and the "bifurcation" between "statutory" and "political¨ roles the opinion in *Hicks I* approved prevents him from performing these two primary political responsibilities the primary voters in his precinct elected him to do.

{¶ 131} Hicks' "indefinite" suspension creates a de facto vacancy for Precinct P1P's CRCCC seat, which directly diminishes the voice of the primary voters who elected Hicks to represent them on the CCRCC. And the (unchallenged) Vacancy Appointment Statute, which controls, does not support the CCRCC's ability to diminish the voice of Precinct P1P's primary voters to that extent. For the same reasons the CCRCC's assertions that this court may not intercede in the internal affairs of the political party were not well taken regarding the questions related to non-precinct-resident-appointees, they are likewise unpersuasive to questions related to Hicks' indefinite suspension. This court has the authority to interpret the relevant, *unchallenged* statutes the General Assembly put in place that control non-precinct-resident-appointees, the circumstances that create vacancies, and to apply those interpretations to Hicks' injunctive claims.

{¶ 132} Finally—a caution. This dissent should not be read to mean that the

CCRCC has no right to suspend an unruly, disruptive, or threatening member from a meeting. Of course it does—as discussed, it is not subject to constitutional constraints unless acting pursuant to the Governmental Appointment Statute. And no private organization must tolerate unduly, disruptive behavior. The CCRCC has the right, through its own rules and processes, to manage occasions when such behavior occurs. Suspending a member for a meeting or for a shorter, defined period to quell disruption does not qualify as creating a "de facto vacancy" in contradiction to the Vacancy Appointment Statute. As long as the suspension is not "indefinite," does not suspend the member for his or her entire remaining term, and does not prohibit that member from participating in meetings held pursuant to the Governmental Appointment Statute, courts would have no authority to intercede in the CCRCC's decision to suspend a member because that *would* be limited to a wholly "internal" political decision. The Vacancy Appointment Statute would not apply because a de facto vacancy would not occur. Hicks and the other members of the CCRCC are grownups who hold passionate political beliefs and responsible positions—they should conduct themselves accordingly.

{¶ 133} The Vacancy Appointment Statute does not permit the CCRCC to "indefinitely" suspend a member because doing so creates a de facto vacancy, contrary to statute. Because this relates closely to Hicks' second assignment of error regarding "bifurcation," I would sustain this error. Because further definition of "statutory functions" is unnecessary within this framework, I would overrule Hicks' sixth assignment of error.

## II. Conclusion

{¶ 134} I would reverse and remand the case back to the trial court for further proceedings consistent with these findings.

# J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

_____
/s/ Robin N. Piper, Presiding Judge


_____
/s/ Mike Powell, Judge


(concurring in part, dissenting in part, and concurring in judgment only, in part)
Melena S. Siebert, Judge